2026 IL App (1st) 250113-U

FIFTH DIVISION
August 7, 2026

No. 1-25-0113

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 1060101 |
| | ) | |
| RAEKWON DRAKE, | ) | Honorable |
| | ) | Laura Ayala-Gonzalez, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's 14-year sentence for second degree murder because we find no abuse of discretion in the sentence imposed.

¶ 2     Following a jury trial, defendant Raekwon Drake was found guilty of second degree murder and sentenced to 14 years' imprisonment. On appeal, Mr. Drake argues the trial court abused its discretion in imposing the sentence in light of his age, lack of prior offenses, and rehabilitative potential. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     Mr. Drake was charged by indictment with multiple offenses, arising out of an incident in Chicago on July 10, 2021. The State proceeded on two counts of the first degree murder of Martin Palafox (720 ILCS 5/9-1(a)(1), (2) (West 2020)).

¶ 5     The evidence at trial was that, in July of 2021, Mr. Drake was living with his girlfriend, Armani Brown, and their dog in an apartment on the 1800 block of South Paulina Street. On July 10, 2021, about 6 p.m., Mr. Drake walked his dog outside his apartment and was confronted by Mr. Palafox and another man. Mr. Palafox took the dog and the two men fled on foot. Mr. Drake returned to his apartment, retrieved a firearm, chased the two men, and after an exchange of gun shots, shot and killed Mr. Palafox.

¶ 6     Mr. Drake and Ms. Brown's upstairs neighbor, Nicole Znosko, testified that she was in her apartment. She heard about four shots and then hid behind a couch. She went downstairs in order to let the dog in and heard four to six more gunshots. Outside, she saw Mr. Drake sitting on the steps with a bullet wound in his right shoulder, and Ms. Brown standing in front of him. The dog was no longer there. Ms. Znosko called the police.

¶ 7     The State entered into evidence a compilation of clips from a number of surveillance videos captured from multiple cameras at the scene. We have viewed the compiled clips which are part of the record on appeal and do not contain audio. In the videos, Mr. Palafox and another man pursue Mr. Drake and his dog. Mr. Drake flees to his apartment as the two men run the opposite way, with Mr. Palafox holding the dog. Then, Mr. Drake returns outside and runs after the two men while pointing a firearm at them. Mr. Palafox drops the dog while the other man moves out of frame. Mr. Drake raises his firearm at Mr. Palafox, who falls to the ground. Ms. Brown runs to Mr. Palafox and punches him as he attempts to stand. Meanwhile, the dog runs away. Mr. Drake

then punches Mr. Palafox, who stumbles back, falls to the ground, and rolls onto his back. Mr. Drake punches Mr. Palafox about four more times. Mr. Palafox sits up, and Mr. Drake stands with his legs on either side of Mr. Palafox. Mr. Drake looks up for a moment, and then appears to shoot Mr. Palafox in the head. Mr. Drake flees with Ms. Brown while placing the firearm in his waistband.

¶ 8 The State presented evidence that police recovered a firearm near Mr. Drake's apartment. The firearm was found to have fired six cartridge cases that were recovered from the scene of the shooting, as well as a cartridge case that was recovered from a gangway near Mr. Drake's apartment entrance. There were an additional five cartridge cases recovered from the intersection of Paulina and 18th that were not fired from this firearm.

¶ 9 Mr. Palafox's autopsy revealed he died from gunshot wounds entering the back of his head, the top of his head near the forehead, and the right side of the back of his neck.

¶ 10 The defense called Ms. Brown, who testified that she met Mr. Drake in June 2020. They moved into the apartment on Paulina in December 2020. Mr. Drake gifted Ms. Brown their dog, a purebred French bulldog costing $4000 to $5000. On June 10, 2021, at about 6 p.m., Mr. Drake left the apartment to take the dog for a walk. Mr. Drake returned looking "frantic" and "hurt." He told Ms. Brown that someone attempted to rob him and take the dog. Ms. Brown and Mr. Drake went outside. During the incident, Ms. Brown was shot in her right shoulder and Mr. Drake was shot in the back.

¶ 11 Lewis Adams, the dean of students and basketball coach at Mr. Drake's high school, testified that he had known Mr. Drake for 15 or 16 years. Mr. Adams first met Mr. Drake at an eighth-grade basketball game. Mr. Adams stated that, while Mr. Drake attended high school, he was "always a stand-up guy, willing to help others, [and] never got in trouble."

¶ 12    The jurors were instructed on first degree murder, second degree murder and self defense. They found Mr. Drake guilty of second degree murder.

¶ 13    At sentencing, the trial court considered Mr. Drake's presentence investigation report (PSI). The PSI reflected that Mr. Drake was about 22½ years old at the time of the incident. He had no prior juvenile or adult convictions. He reported that he never had "much of a relationship" with his father and did not know his mother. His grandmother was his most-involved caregiver. Mr. Drake described his childhood as "good" and said he was "well-kept and disciplined" by his grandmother and experienced no abuse. He was in a committed relationship with Ms. Brown and had a "tight relationship" with his family.

¶ 14    The PSI also reflected that Mr. Drake graduated from high school in 2018. He played varsity basketball all four years of high school, was considered a "star athlete," and earned "A's and B's." He graduated from a community college in 2010 and had been on the basketball team with hopes of playing Division I basketball. Mr. Drake stated that he wanted to become an assistant basketball coach.

¶ 15    Mr. Drake denied gang involvement. He had never been diagnosed with mental health issues. Mr. Drake also denied problems with alcohol or using illegal drugs. He felt that his case was "unjust due to the video evidence," and asserted that the event had "happened so fast that he had to react in a way that [would] save his life and his girlfriend's life."

¶ 16    In aggravation, the State published a victim impact statement by Mr. Palafox's mother, who described learning of Mr. Palafox's death and identifying his body at the morgue. She stated that Mr. Palafox was "taken too soon," and she prayed every night that Mr. Palafox would "get justice" so he could rest knowing his life mattered.

¶ 17    The State also published the victim impact statement of Mr. Palafox's sister, Erica Palafox.

Erica described the emotional impact of receiving the call from the hospital reporting her brother's death, and then having to tell her family that he had died. She described Mr. Palafox as the "glue to [her] family" and said he was a "great brother and a good person."

¶ 18    Carla Camargo, another sister of Mr. Palafox, read her statement onto the record. She related that Mr. Palafox was "the only one that was there for [her] when no one else was." She said that Mr. Palafox wanted a better life, was not a "bad person," and was a "good dad to his stepdaughter and a great uncle and brother." She knew Mr. Palafox made the "wrong" choice, but he had no weapon and there was "plenty of time to call the police." Ms. Camargo concluded that "[j]ustice isn't killing someone and getting away with it," and "[e]veryone should have to pay the consequences for their actions."

¶ 19    The State argued that, after Mr. Drake's dog was taken from him, he "gain[ed] the safety of his home" but nonetheless chose to arm himself and go back outside. He then "chose to shoot at the people fleeing with his dog," even after Mr. Palafox released the dog. While Mr. Palafox was on the ground, Mr. Drake "hit [him], put the gun to the back of his head, looked around, and then pulled the trigger twice." The State requested the maximum sentence of 20 years given the seriousness of the offense and the need to deter others from "taking the law into their own hands." The State also argued that Mr. Drake had time to contemplate before acting because the video showed him pause and look around before shooting Mr. Palafox in the head.

¶ 20    In mitigation, Mr. Drake presented emails and text messages reflecting that, when he was released from jail on bond during the pendency of the case, he had been in the process of being hired at a restaurant.

¶ 21    Mr. Drake also presented a letter written by Rickey Claybron Sr., the athletic director at Manley Career Academy High School. Mr. Claybron described Mr. Drake as having a "positive

impact on our community" and displaying "exceptional respect for both adults and peers." Mr. Drake was "not only a standout basketball player but also excelled in the classroom." Despite Mr. Drake's challenges, he "continue[d] to exemplify *** integrity and leadership." Mr. Claybron had invited Mr. Drake to work as a mentor and trainer for Manley Career Academy's basketball players because of Mr. Drake's "passion for basketball and his ability to connect with young people." Mr. Drake had left a "profound" impact and inspired students who were "previously undecided about their futures to focus on their education, improve their behavior, and set meaningful goals." Mr. Claybron concluded that "with the opportunity to mentor and coach, [Mr. Drake] can play a pivotal role in steering youth away from negative influences and toward brighter futures."

¶ 22    Defense counsel argued that, "from day one," Mr. Drake accepted responsibility for what he did. Counsel also described speaking with a sportswriter who had reported on Mr. Drake's high school basketball team because the school's area had the "most dense amount of crime" in Chicago. In 2017, two of Mr. Drake's team members were shot and killed during a basketball season. Counsel further noted that Mr. Drake had little contact with his father and no contact with his mother. Nonetheless, this was not a "story" about a "kid" who grew up in "horrible circumstances" and "fell prey" to his environment. Rather, it was a "remarkable story" about a "kid" who "never fell prey" to his environment. Counsel stated that, on June 10, 2021, both a "life was lost" and a "young man's dream," but Mr. Drake would "make the best of this."

¶ 23    In allocution, Mr. Drake apologized to Mr. Palafox's family, and stated that no mother or sister should have to bury a loved one. Mr. Drake stated that, at the time of the sentencing hearing, his grandmother was "on her deathbed." His grandfather, whom Mr. Drake had been caring for since Mr. Drake was little, "almost died" while Mr. Drake was away. Mr. Drake further recounted that, "at the same time this happened," he had received a scholarship to play basketball, and the

Sacramento Kings NBA team offered him a $5 million contract. Mr. Drake said, "I lost all that sitting in Cook County Jail." He explained that he chose to play basketball because his family lived in a "messed up" world and he wanted to "get [them] out." While his dream of playing in the NBA was now over, he wanted to be a basketball coach to "inspire other kids in the neighborhood." Mr. Drake reiterated, "No parent should have to bury [their] loved ones. I truly apologize for that. I'm sorry."

¶ 24　　The trial court sentenced Mr. Drake to 14 years' imprisonment to be served at 50% with 1 year of mandatory supervised release and 1,243 days' credit for time served. In imposing sentence, the court stated that it considered the trial evidence and the gravity of the offense, the PSI, the financial impact of incarceration, evidence in aggravation and mitigation, Mr. Drake's rehabilitative potential, his allocution, and sentencing alternatives.

¶ 25　　The court stated that it "could not forget" the video of the incident. The court described the killing itself as follows:

> "[Y]ou had the gun. And even though Mr. Palafox was on the ground without being armed, you shot twice. He had no weapon in his hand. He did not have your dog. The dog was gone. He was pleading for his life. And in that rage and at that moment, you decided to take a life."

While the court believed that Mr. Drake was "rightfully" defending his dog, Mr. Drake "had plenty of time to stop." It remarked that Mr. Drake could have taken his dog inside and called the police, which "would have ended it." Mr. Drake, however, went "straight for [his] gun" and took it upon himself to "devalue someone's life." Moreover, Mr. Palafox was unarmed and no longer had Mr. Drake's dog when Mr. Drake, "in that rage," shot him. The court explained, "Those are actions that I believe carry a lot more weight in my sentence." The court also found that the sentence

imposed "should send a clear warning to anybody else thinking that they could go about doing this" in Chicago.

¶ 26    The court remarked that the case was "one of the most tragic situations" it had seen, as Mr. Palafox's life was taken unnecessarily and Mr. Drake's dreams ended. The court stated that "all one can do is hope and pray that one life who is still with us, [Mr. Drake], will have the opportunity to survive and excel in spite of everything that has happened," and that Mr. Palafox's family will have "some sort of closure" and "hopefully continue to live with some peace of mind knowing that justice was done." Noting Mr. Drake's lack of criminal history, the court believed that his actions in killing Mr. Palafox were so "out-of-the-ordinary" for Mr. Drake that it did not believe he "would ever redo that." Also, Mr. Drake had "true potential for rehabilitation" and his apology was "something to be noted." The court explained that the case neither warranted the maximum nor the minimum, and it hoped Mr. Drake would do the best he could while incarcerated and make the most of his life once released.

¶ 27    Mr. Drake filed a motion to reconsider sentence, arguing that the court did not adequately consider his lack of criminal history and rehabilitative potential. The court denied the motion, but entered a corrected mittimus reflecting 31 days' credit for Mr. Drake's participation in an adult education program.

¶ 28                                    II. JURISDICTION

¶ 29    The trial court denied Mr. Drake's motion to reconsider on January 9, 2025, and he timely filed his notice of appeal that same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021), governing appeals from final judgments in criminal cases.

¶ 30                                    III. ANALYSIS

¶ 31     On appeal, Mr. Drake contends that the trial court abused its discretion in imposing a 14-year sentence in light of his age, lack of criminal history, and rehabilitative potential. Mr. Drake contends that there could be no basis in this case for imposing any sentence beyond 12 years, which was the middle of the 4 to 20 year sentencing range.

¶ 32     The Illinois Constitution requires the trial court to sentence a defendant according to the seriousness of the offense and with the goal of returning him to useful citizenship. Ill. Const. 1970, art. I, § 11. The legislature prescribes the permissible sentencing ranges for criminal offenses, while the trial court imposes a sentence within that range. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. The trial court must weigh both aggravating and mitigating factors in fashioning a sentence. See 730 ILCS 5/5-5-3.1 (West 2020) (factors in mitigation); 730 ILCS 5/5-5-3.2 (West 2020) (factors in aggravation).

¶ 33     Trial courts have broad discretionary powers in imposing a sentence. *People v. Brown*, 2025 IL App (1st) 230772, ¶ 150. This is because trial courts are in a better position than this court to "view, evaluate, and weigh 'such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). When determining whether the trial court based its sentence on appropriate aggravating and mitigating factors, we will consider the record as a whole, rather than focusing on a few words or statements by the trial court. *People v. Wade*, 2025 IL App (1st) 231683, ¶ 70. We presume the trial court evaluated the relevant factors in mitigation, and that presumption cannot be overcome without affirmative evidence to the contrary. *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 40. A sentence within the applicable sentencing range is presumed proper. *Brown*, 2025 IL App (1st) 230772, ¶ 150.

¶ 34    We review a trial court's sentencing decision for an abuse of discretion and can only modify the decision where it "deviates from the intent and purpose of the law or is clearly disproportionate to the nature of the offense." *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 44. We will not substitute our judgment for that of the trial court and we cannot reduce a sentence simply because we would have weighed the sentencing factors differently. *Id.*

¶ 35    Here, Mr. Drake was found guilty of second degree murder, a Class 1 felony (720 ILCS 5/9-2(d) (West 2020)) subject to a sentencing range of 4 to 20 years' imprisonment (730 ILCS 5/5-4.5-30(a) (West 2020)). Because Mr. Drake's 14-year sentence fell within the statutory range, we presume it proper. *Brown*, 2025 IL App (1st) 230772, ¶ 150.

¶ 36    Mr. Drake argues that the trial court failed to give adequate weight to the factors in mitigation. We must presume the trial court properly considered the mitigating evidence before it, absent anything in the record that rebuts that presumption. See *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 47. The record here does not rebut this presumption. To the contrary, the court thoroughly explained its sentencing decision, and expressly stated that it considered the PSI, the evidence in mitigation and aggravation, the seriousness of the crime, and Mr. Drake's rehabilitative potential.

¶ 37    The trial court was "not required to recite or assign a value to each factor in mitigation or aggravation that forms part of the record." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55. Nonetheless, the record affirmatively shows that the court did thoroughly consider these mitigating factors, which were included in Mr. Drake's PSI. The court remarked at length on Mr. Drake's character and potential for rehabilitation.

¶ 38    Specifically, the court noted Mr. Drake's lack of criminal history and that his actions in killing Mr. Palafox were so "out-of-the-ordinary" for Mr. Drake that it did not believe he "would

ever redo that." The court also found that Mr. Drake had a high chance of rehabilitation and was unlikely to repeat the crime. The court commended Mr. Drake's hard work in pursuing his dream as a basketball player and noted that the incident was out of character for Mr. Drake. The mitigating factors, however, did not require the court to impose a minimum sentence. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 39    The record makes it clear that the court imposed the sentence that it did, not because it refused to consider the mitigating factors, but because of the way it viewed the seriousness of Mr. Drake's offense. The court observed that, while Mr. Drake's actions may have been unusual for him, what he did was avoidable and led to a life lost. The court recounted the evidence at trial showing Mr. Drake had chased down Mr. Palafox after Mr. Palafox attempted to steal Mr. Drake's dog. Mr. Drake shot Mr. Palafox while Mr. Palafox was unarmed on the ground, and no longer holding Mr. Drake's dog.

¶ 40    The court also found that the sentence it imposed was necessary to deter others from similarly taking the law into their own hands. See 730 ILCS 5/5-5-3.2(a)(7) (West 2020) (the necessity to deter others from committing the same crime is a relevant statutory factor in aggravation). The court's considerations were proper and supported its sentencing decision, and we cannot reduce a sentence simply because we would have weighed these aggravating factors differently. *Gray*, 2025 IL App (1st) 191086-B, ¶ 44.

¶ 41    Ultimately, Mr. Drake asks this court to reweigh the factors in aggravation and mitigation, which we cannot do. This sentence does not reflect an abuse of the trial court's discretion.

¶ 42                                    IV. CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 44    Affirmed.